IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| J. ANTHONY HUTT et al., )<br>)<br>Plaintiffs, )<br>)<br>)<br>)<br>)<br>STANLEY W. TAYLOR, JR. et al., )<br>)<br>Defendants. ) | C. A. No. 08-184 GMS |

## MEMORANDUM

### I. INTRODUCTION

The plaintiffs are all current or former inmates incarcerated at the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware.[1] On April 3, 2008, the plaintiffs filed a complaint against the current and former Commissioners of the Delaware Department of Corrections (the "DDOC"), Stanley W. Taylor ("Taylor") and Carl C. Danberg ("Danberg"), respectively; the current and former Wardens of HRYCI, Raphael Williams ("Williams") and Philip Morgan ("Morgan"), respectively; the current Chief of the Bureau of Management Services of the DDOC, Joyce Talley ("Talley") (collectively, the "State defendants"); Correctional Medical Services, Inc. ("CMS"); and unnamed "John Doe" employees of CMS. The plaintiffs' claims arise under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. The plaintiffs allege that the defendants failed to provide constitutionally adequate medical care. The plaintiffs also allege medical malpractice under Delaware law.

---

[1] There are 17 individual plaintiffs: J. Anthony Hutt, Theodore T. Marek, Carl Martin, Michael Derrickson, Hippilito Moure, James N. McCardell, Charles Smith, Charlie Villafane, William Selby, Kevin Jones, James Smith, Paul Miller, Terrance Sirmans, Samuel Jones, John Chavous, Alvin Williams, and Devon Clark.

On March 30, 2009, the court issued a Memorandum and Order (D.I. 27), dismissing the plaintiffs' 42 U.S.C. § 1983 claims against CMS, because the court concluded that the plaintiffs' allegations regarding CMS' inadequate medical care failed to state a claim. On March 16, 2010, the parties filed a stipulation (D.I. 70) to dismiss all claims against Taylor and Williams, which the court granted.

Presently before the court are motions for summary judgment filed by the remaining State defendants and CMS. For the reasons discussed, the court will grant the State defendants' motion for summary judgment, and grant in part and deny in part CMS' motion for summary judgment.

## II. BACKGROUND

The plaintiffs, each of whom suffers from Diabetes (Type-2), were inmates incarcerated at the HRYCI during the relevant time period set forth in the amended complaint. While housed at HRYCI, the plaintiffs received treatment for their diabetes. (D.I. 129 at 3.) During this time, the DDOC contracted with CMS to provide medical and health care services to the inmates. (Id. at 2.) On July 5, 2006 and July 9, 2006, two of the plaintiffs, William Selby ("Selby") and Alvin Williams, filed grievances, claiming that a CMS nurse, who was identified as "Nurse Beth," had not followed standard protocol for testing blood sugar levels and administering insulin injections. (Id. at 3; D.I. 137 at 3.) Shortly thereafter, plaintiffs J. Anthony Hutt ("Hutt"), Hippilito Moure, and Paul Miller ("Miller") filed similar grievances. (D.I. 137 at 3.) Specifically, the grievances stated that, on several occasions between April 10, 2006 and July 9, 2006, Nurse Beth used a single hypodermic needle to draw blood from the plaintiffs to test their blood sugar levels, and then used the same needle to draw insulin from a multiple dose vial and inject them with the insulin. (Id. at 3; D.I. 129

at 3.)

These grievances prompted the DDOC to initiate an internal investigation.[2] (D.I. 137 at 4.) The DDOC investigation included interviews with Nurse Beth, and two of her co-workers, Nurse Jessica Niba, and Nurse Colleen Bell. (Id.) The DDOC investigators also interviewed Jackie Sue Powell, a correctional officer, and plaintiffs Alvin Williams, Selby, James McCardell and James Smith. (Id.) On August 18, 2006, the DDOC internal affairs unit issued a memorandum regarding their investigation. Specifically, the DDOC investigators concluded that "some of the [inmates'] allegations [regarding Nurse Beth's procedure for administering insulin] are true." (D.I. 130 at A00055.) The DDOC investigators also concluded, however, that "it has proven virtually impossible to identify the specific dates of occurrence or the specific [] inmates involved." (Id.)

In addition to conducting the DDOC internal investigation, the DDOC and CMS contacted the Delaware Division of Public Health to develop a response plan and notify anyone who may have been at risk of infection based upon the plaintiffs' allegations. (D.I. 129 at 4.) On July 20, 2006, HRYCI officials met with all of the diabetic inmates and provided each with a document entitled Patient Information Sheet (the "PIS"). (See D.I. 126 at SD005354.) The PIS summarized the allegations against Nurse Beth, stated that HRYCI was investigating the charges, noted the proper procedure for administering insulin, and stated that Nurse Beth had denied the allegations. (Id.) A hand written addendum to the PIS stated "[s]ome patients in the group have tested positive for hepatitis C." (Id.) Finally, the PIS stated that CMS was offering the inmates blood testing and counseling. (Id.) According to the PIS, the blood testing was offered in three steps: (1) an initial

---

[2] The DDOC also suspended Nurse Beth in July 2006, and asked her to leave HRYCI. (D.I. 130 at A00046.)

3

blood test at the time of counseling; (2) if the first test was negative, then a second blood test in three months; and (3) if the second blood test was negative, then a third blood test in six months. (Id.)

After receiving testing for hepatitis and HIV/AIDS, five of the seventeen plaintiffs tested positive for hepatitis: Hutt tested positive for hepatitis C (See D.I. 31 ¶ 16), Devon Clark ("Clark") tested positive for hepatitis C (id. ¶ 210), Charles Smith ("Smith") tested positive for hepatitis C (id. ¶ 89), Kevin Jones ("Jones") tested positive for hepatitis B (id. ¶ 126), and Miller tested positive for hepatitis A (id. ¶ 150). In addition to testing the inmates, CMS retained Helen Kwakwa, M.D., M.P.H. ("Dr. Kwakwa"), to review the test results and render an expert opinion concerning the extent to which the inmates actually contracted some blood-borne illness as a consequence of the incident. (D.I. 137 at 6.) After reviewing the test results, Dr. Kwakwa concluded, "[c]urrent available laboratory data indicate no transmission of [h]epatitis A, B or C, or HIV as a result of the alleged July 7, 2006 incident. Had transmission occurred, the data obtained at 6 months should have indicated so. Therefore, no further testing is recommended in follow up to this alleged incident." (D.I. 126 Ex. D at CMS00224.)

## III. THE PARTIES' CONTENTIONS

The plaintiffs assert that the State defendants, as supervisors responsible for the administration of health care to inmates, failed to insure that CMS provided constitutionally adequate medical care. With respect to their claims brought against Talley in her individual capacity, the plaintiffs allege that she: (a) adopted and implemented policies and practices which were intended to contain the costs of providing medical services to the plaintiffs, and which she knew or should have known would cause CMS to provide personnel who were not qualified or properly trained to provide medical care that met the minimum requirements of the Eighth Amendment; and (b) adopted

and implemented policies and practices which encouraged CMS to provide for testing and treatment for their medical conditions that did not meet the minimum requirements of the Eighth Amendment. To support their assertions, the plaintiffs offer the findings of the United States Department of Justice (the "DOJ") investigation as evidence that the medical care provided by DDOC was constitutionally inadequate, and was the result of policy and practice that condoned inadequate medical care and oversight.[3] (D.I. 137 at 19-20.) Specifically, the investigation revealed that "there was no functioning chronic disease registry at HRYCI[,]" and that "care was 'especially poor for inmates with diabetes . . . ." (Id. at 19; D.I. 138 at PB8.)

The plaintiffs further allege that CMS failed to render and provide medical services in conformity with the applicable standards of care and committed medical negligence within the meaning of Del. Code Ann. tit. 18, § 6801. The plaintiffs aver that they have suffered physical and psychological pain including anxiety and depression as a direct and proximate result of CMS' failure. As previously mentioned, only five of the seventeen plaintiffs tested positive for hepatitis: Hutt, Clark, Smith, Jones, and Miller. These five plaintiffs claim that CMS' medical negligence caused their hepatitis diagnoses. All of the plaintiffs further claim that CMS' medical negligence caused them to fear that they would contract a blood-borne illness, and that their fear is compensable.

---

[3] The Civil Rights Division of the DOJ conducted an investigation of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government to identify and root out systemic abuses. The investigation found substantial civil rights violations at four of the five facilities: Delores J. Baylor Women's Correctional Institution, HRYCI, Delaware Correctional Center, and Sussex Correctional Institution. The investigation resulted in the entry of a memorandum of agreement, on December 29, 2006, between the DOJ and the State of Delaware regarding the four institutions. Paragraph I.F. of the agreement provides that it may not be used as evidence of liability in any other legal proceeding. *See Price v. Kozak*, 569 F. Supp. 2d 398 (D. Del. 2008).

With regard to the care provided to the plaintiffs, their medical expert, Irwin Lifrak, M.D. ("Dr. Lifrak"), opines that:

> It is my opinion based on reasonable medical probability that there has been health care medical negligence committed by CMS and its employees and the negligence proximately cause the injuries sustained by the plaintiffs. . . .
>
> It is my opinion that the [procedure used by Nurse Beth to administer insulin] breached the standard of care and proximately caused [the] plaintiffs' injuries by transmission of blood-borne pathogens through repeated use of the same insulin vials and/or syringes. . . . It is also my opinion that frequent past shortage of supplies of lancets made it foreseeable that CMS employees would utilize syringes to prick the finger and then use the same syringe in multi-dose vials of insulin thereby creating a high risk of harm to the inmates receiving insulin. In my opinion allowing this practice constitutes deliberate indifference on the part of the defendants to serious medical needs of the plaintiffs.

(D.I. 126 Ex. G at 1.) Dr. Lifrak further opines that the timing of the testing and results "do not absolutely rule out the possibility that [h]epatitis could have been transmitted to [Hutt, Miller, or Jones] as a result of the manner in which Nurse Beth is alleged to have administered insulin to them." (D.I. 133 at PA147.)

Talley asserts that there is no record evidence demonstrating that she participated in the medical care provided to the plaintiffs.[4] She further asserts that the DDOC does not have a policy to delay or deny medical care to inmates based on costs. Summary judgment is appropriate, argues Talley, because the plaintiffs have failed to identify any custom or policy that created an unreasonable risk of an Eighth Amendment violation. In addition, Tally argues that summary judgment is appropriate because a non-medical prison official will generally be justified in believing

---

[4] The court discusses only Talley's arguments, because she is the only State defendant sued in her individual capacity. Thus, if the court finds that she committed no constitutional violation and summary judgment in her favor is appropriate, it then follows that Danberg and Morgan are entitled to summary judgment.

that an inmate is in capable hands, when that inmate is under the care of a medical professional.

(D.I. 129 at 16.)

> With respect to the care provided, Talley states:
>
> From July 1996 to February 2009, I served as Chief of the Bureau of Management Services
>
> The[] . . . Bureau of Management Services . . . provided support to all units within the Department, including: fiscal, payroll, accounts payable, budgeting, purchasing, warehousing, food services, healthcare for the inmates, substance abuse treatment, management information services, facilities maintenance and construction. The Bureau of Management Services was also assigned the administration of the health services contract . . . .
>
> To the extent there is a claim that the Department adopted policies intended to contain the costs of providing medical services to inmates thereby causing CMS to provide constitutionally deficient care, the allegation is not true. As a government agency, reducing costs is always a concern and often factored into Department contracts, but the Department did not implement policies or practices that would cause CMS to provide constitutionally deficient care. . . . The Department and the various venders were . . . always looking for ways of increasing the quality of medical care services within the budget. For example, if a number of inmates needed to see an outside specialist, the specialist would be brought into the facility to see the inmates. As another example, the Department recognized that it could save money by buying a number of dialysis machines and placing them in the institutions for the inmates that needed them rather than arranging for inmates to transport outside the facility for dialysis.
>
> At no time during 2006, did I participate in any decision regarding the healthcare of [the plaintiffs]. I have no medical training and do not provide medical care to anyone.

(D.I. 130 Ex. 7 at A00072-74.)

CMS contends that summary judgment in its favor is appropriate for two reasons. First, CMS contends that the incidents involving Nurse Beth were not the proximate cause of the physical injuries of the plaintiffs who tested positive for hepatitis. Second, CMS contends that fear of contracting a blood-borne illness is not compensable where testing has ruled out that possibility, and

in the absence of physical harm suffered by the plaintiffs.

In addition to relying on Dr. Kwakwa's conclusions, CMS proffers the expert report of Ronald L. Koretz, M.D. ("Dr. Koretz"). Dr. Koretz reviewed the files and medical records of the five plaintiffs who tested positive for hepatitis after the Nurse Beth incidents, Hutt, Clark, Smith, Jones and Miller. Dr. Koretz opines that none of the inmates contracted any blood-borne illness as a consequence of the incidents. (D.I. 126 Ex. F at 1-2.)

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). The facts must be viewed in the light most favorable to the nonmoving party and all reasonable inferences from the evidence must be drawn in that party's favor. *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law,

summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

IV.   **DISCUSSION**

    A.   **The Plaintiffs' Claims Against the State Defendants**

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). In order to set forth a cognizable claim, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by intentionally denying or delaying access to medical care. *Estelle*, 429 U.S. at 104-05.

[A] prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-40 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under section 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, mere disagreement as to the proper medical treatment is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d

218, 235 (3d Cir. 2004) (citations omitted). Significantly, when an inmate is under the care of medical experts,

> a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Id.* at 236; *see also Woloszyn v. County of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005).

Liability in a section 1983 action cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). A plaintiff may, however, set forth a claim for supervisory liability under section 1983 if he (1) identif[ies] the specific supervisory practice or procedure that the supervisor failed to employ, and show[s] that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). It is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had done more. *Brown*, 269 F.3d at 205. He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury.

Considering the record in the light most favorable to the plaintiffs, the court concludes that summary judgment is appropriate for several reasons. First, there is no record evidence

demonstrating that Talley was involved in or even knew of the plaintiffs during the events in dispute. Second, the plaintiffs have not presented any evidence to refute Talley's declaration nor shown anything more than conjecture to establish liability.[5] Third, the record evidence demonstrates that the State defendants took immediate action upon receiving notice of the grievances filed against Nurse Beth. Not only did the State defendants conduct an internal investigation into Nurse Beth's procedure for administering insulin, but they also met with the diabetic inmates on July 20, 2006, handed out the PIS, and tested the inmates for blood-borne illnesses within a few days of the meeting.[6] Finally, while the plaintiffs urge the court to consider the DOJ investigation, the court declines to embrace any findings in light of the specific caveat that the agreement between the State of Delaware and the DOJ may not be used as evidence of liability in any other legal proceeding.[7]

### B.    The Plaintiffs' Claims Against CMS

In Delaware, medical negligence is governed by the Delaware Health Care Negligence Insurance and Litigation Act (the "Act"). Del. Code Ann. tit. 18, §§ 6801-6865. Pursuant to Del. Code Ann. tit. 18, § 6801(7), medical negligence is defined as:

---

[5] Indeed, the plaintiffs' entire theory of liability is predicated upon Talley's supervisory role and alleged Eighth Amendment violations by CMS. As previously noted, however, the court dismissed the plaintiffs' claims against CMS for failure to state a claim. Thus, the plaintiffs cannot now contend that Talley is liable for CMS' alleged constitutional deprivations.

[6] The plaintiffs even recognize the swift action taken by the State defendants, as their answering brief in opposition to the motion for summary judgment states that "[t]he HRYCI officials clearly considered that the matter [Nurse Beth's allegedly improper procedure for administering insulin] needed to be addressed immediately. The meeting [with the diabetic inmates] appears to have taken place around 10:50 p.m., well after the normal 'lights out' time at the prison." (D.I. 137 at 9.)

[7] Because the court concludes that the State defendants committed no Eighth Amendment violation and will grant the State defendants' summary judgment motion on that ground, it need not consider the State defendants' alternative grounds for summary judgment.

any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.

The Act creates a statutory scheme that imposes rigid requirements on plaintiffs seeking to bring tort claims arising from the provision of medical services. *Conway v. A.I. DuPont Hosp. for Children*, Civil Action No. 04-4862, 2009 WL 57016 at *5 (E.D. Pa. Jan. 6, 2009). Thus, to establish a claim for medical negligence, a plaintiff must present "expert medical testimony . . . as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death. . . ." Del. Code Ann. tit. 18, § 6853(e). In other words, when a party alleges medical negligence, Delaware law requires the party to produce expert testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury. *Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)); *see* Del. Code Ann. tit. 18, § 6853(e). "[T]he production of expert medical testimony is an essential element of a plaintiff's medical [negligence] case," *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991), *cert. denied*, 504 U.S. 912 (1992), and the requirements apply to each plaintiff and each claim.

As previously stated, CMS contends that summary judgment in its favor is appropriate for two reasons: (1) the incidents involving Nurse Beth were not the proximate cause of the physical injuries of the plaintiffs who tested positive for hepatitis; and (2) fear of contracting a blood-borne illness is not compensable in the absence of physical harm suffered by the plaintiffs. The court

addresses each of these arguments in turn.[8]

### 1. Medical Malpractice Claims Based on Positive Hepatitis Tests

The court first addresses the claims of the plaintiffs who tested positive for hepatitis. Preliminarily, the court notes that, although the plaintiffs' amended complaint alleges that Hutt, Clark, Smith, Jones, and Miller tested positive for hepatitis, their brief in response to CMS' motion for summary judgment argues only that Hutt, Jones and Miller contracted hepatitis as a result of the Nurse Beth incidents. The plaintiffs appear to concede – and that court finds that they cannot, as a matter of law, contend – that Clark and Smith each contracted hepatitis as a result of the Nurse Beth incidents.

Clark cannot sustain a medical malpractice claim against CMS for contracting hepatitis, because his confinement records note that he was incarcerated at the Central Violation of Probation Center in Smyrna, Delaware, from February 14, 2006 to May 11, 2006, and the Morris Community Correctional Center in Dover, Delaware, from May 11, 2006 to October 9, 2006. (See D.I. 126 Ex. F ¶ 7; see also D.I. 134 at 7 n.20.) In other words, Clark was not incarcerated at HRYCI at the time of the Nurse Beth incidents, so those incidents could not be the proximate cause of his hepatitis.

Smith also cannot sustain a medical malpractice claim against CMS for contracting hepatitis, because his medical records demonstrate that he tested positive for hepatitis C in April 2005, over one year prior to the Nurse Beth incidents. (See D.I. 126 Ex. F ¶ 4.) Moreover, as the plaintiffs point out in their answering brief, Smith admitted at his deposition that he could not have contracted

---

[8] For purposes of this motion, and because CMS does not challenge the plaintiffs' claims that Nurse Beth deviated from the acceptable standard of care, the court will assume that her alleged failure to follow proper procedure in administering insulin to the plaintiffs deviated from the acceptable standard of care.

hepatitis from the Nurse Beth incidents. (See D.I. 130 at A207-08.)

The court reaches the same conclusion with respect to Miller's medical malpractice claim for contracting hepatitis. Although Dr. Lifrak opines that Nurse Beth's procedure for administering insulin "breached the standard of care and proximately caused [the] plaintiffs' injuries by transmission of blood-borne pathogens through repeated use of the same insulin vials and/or syringes," (see D.I. 126 Ex. G at 1), it is undisputed that Miller tested positive for hepatitis A, which is not a blood-borne illness.[9] (See D.I. 126 Ex. F ¶ 6.) Accordingly, the court will grant CMS' motion for summary judgment as to Clark's, Smith's, and Miller's medical malpractice claims based on contracting hepatitis from the Nurse Beth incidents.

The court reaches a different conclusion with respect to Hutt and Jones for several reasons. First, while CMS relies heavily on Dr. Kwakwa's conclusion that "no inmates contracted any blood-borne illnesses as a consequence of the [Nurse Beth] incident," (D.I. 126 at 5), it is clear from Dr. Kwakwa's deposition that her opinion was based on her belief that a singluar incident occurred on or about July 7, 2006. (D.I. 126 Ex. E at 14.) When asked about the possibility of an incident occurring in May or early June 2006, however, Dr. Kwakwa retreated from her original opinion. (Id.) Dr. Kwakwa explained that it takes about seven weeks for the hepatitis C antibody to turn positive. (Id.) She further explained that her July 2006 test results could not exclude the transmission of hepatitis B or C to an inmate exposed to the viruses in April, May, or early June 2006, and who tested positive for the hepatitis C antibody in July 2006. (Id.) Thus, Dr. Kwakwa

---

[9] The website of the Department of Health and Human Services Centers for Disease Control and Prevention states that hepatitis A is spread most often "by the fecal-oral route (an object contaminated with the stool of a person with hepatitis A is put into another person's mouth)[,]" and less often by "swallowing food or water that contains the virus." http://www.cdc.gov/vaccines/vpd-vac/hepa/in-short-adult.htm (last visited Aug. 13, 2010).

14

could not say with absolute certainty that Hutt and Jones contracted hepatitis prior to the Nurse Beth incidents.[10]

Furthermore, Dr. Koretz, could not say with absolute certainty that either Hutt or Jones contracted hepatitis prior to the Nurse Beth incidents. With respect to Hutt, Dr. Koretz opines from his medical records that it is "very highly likely that [his] infection predated" the Nurse Beth incidents. (D.I. 126 Ex. F ¶ 3.) Dr. Koretz also opines that Jones' negative test for IgM-specific antibody to hepatitis B core antigen "is certain evidence that this infection had to have occurred before April 10, 2006." (Id. ¶ 5.) Dr. Lifrak, however, disputes Dr. Koretz's opinions, stating that the test results and timing of the tests "do not absolutely rule out the possibility that hepatitis could have been transmitted to [Hutt and Jones] as a result of the manner in which Nurse Beth is alleged to have administered insulin to them." (D.I. 133 at PA147.) Dr. Lifrak further notes, "the timing and appearance of antibodies tested is in part dependent upon the amount of antigens. In this case the quantity of virus introduced was in all likelihood small and could be expected to therefore take longer to manifest itself for testing purposes." (Id.) Given the foregoing, the court concludes that Hutt and Jones have demonstrated that a genuine issue of material fact exists as to whether they contracted hepatitis as a result of the Nurse Beth incidents. The court, therefore, will deny CMS' motion for summary judgment as to Hutt's and Jones' medical malpractice claims based on

---

[10] Drawing all reasonable inferences in favor of the plaintiffs, the court sets the time frame of the Nurse Beth incidents from April 10, 2006 to July 9, 2006, because Hutt reported in his medical grievance that Nurse Beth had improperly administered insulin sometime between those dates, (see D.I. 130 at A00089), leaving open the possibility that he could have been exposed to and infected with hepatitis C in April 2006. Moreover, the court is not willing to conclude that the Nurse Beth incidents occurred only on July 7, 2006, given the fact that the DDOC investigators concluded that "it has proven virtually impossible to identify the specific dates of occurrence [of the incidents]. . . ." (D.I. 130 at A00055.) In addition, Dr. Koretz uses the April 10, 2006 to July 9, 2006 time period in conducting his analysis. (D.I. 126 Ex. F.)

contracting hepatitis from the Nurse Beth incidents.

      2.  Medical Malpractice Claims Based on a Fear of Contracting Blood-borne Illnesses

  Finally, the plaintiffs allege that they have demonstrated compensable injuries based on a fear of contracting blood-borne illnesses as a result of the Nurse Beth incidents. Conversely, CMS contends that summary judgment is appropriate, because fear of contracting a blood-borne illness is not compensable in the absence of physical harm suffered by the plaintiffs. After having considered the relevant authority, the court agrees.

  Under Delaware law, "[i]n any claim for mental anguish, whether it arises from witnessing the ailments of another or from the claimant's own apprehension, an essential element of the claim is that the claimant have a present physical injury." *Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984) (citations omitted). The Delaware Supreme Court, in *Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995), elaborated on its holding in *Mergenthaler*, in ruling on a "fear of AIDS" case:

> [The] plaintiffs have alleged no injuries which stem from their exposure to HIV. Instead, plaintiff's alleged "injuries" arise solely out of their *fear* that they have been exposed to HIV. In essence, they claim mental anguish damages for their "fear of AIDS." As noted in *Mergenthaler*, however, damages for claims of emotional distress or mental anguish (which would include fear of contracting a disease) are recoverable only if the underlying physical injury is shown. 480 A.2d at 651. *In this case, plaintiffs have sustained no physical injury, and, therefore, they could not recover under a negligence theory. Id.*

668 A.2d at 1362 (emphasis added). Thus, the court concluded that a plaintiff could not recover under a negligence theory in the absence of physical injury. In the present case, Hutt and Jones are the only plaintiffs who arguably have sustained a physical injury. (See D.I. 134 at 19.) Thus, pursuant to the holdings of *Mergenthaler* and *Brzoska*, Hutt and Jones are the only plaintiffs who

can recover mental anguish damages based on a fear of contracting blood-borne illness, and the court will grant CMS' motion for summary judgment on the remaining plaintiffs' fear of blood-borne illness claims.

## V. CONCLUSION

For the aforementioned reasons, the court will grant the State defendants' motion for summary judgment, and grant in part and deny in part CMS' motion for summary judgment. The court will grant CMS' motion as to the medical malpractice claims brought by Theodore T. Marek, Carl Martin, Michael Derrickson, Hippilito Moure, James N. McCardell, Charles Smith, Charlie Villafane, William Selby, James Smith, Paul Miller, Terrance Sirmans, Samuel Jones, John Chavous, Alvin Williams, and Devon Clark. The court will deny CMS' motion as to the medical malpractice claims brought by J. Anthony Hutt and Kevin Jones.

Dated: August 20, 2010

CHIEF, UNITED STATES DISTRICT JUDGE

17